1  GEORGE A. FOSTER (SBN 65824)
   JOHN BOYCE JR (SBN 123698)
2  FOSTER ♦ WALSH, LLP
   9201 Spectrum Center Boulevard, Suite 210
3  San Diego, CA 92123
   Telephone: (858) 300-9950
4  Facsimile: (858) 300-9951
   gfoster@fosterwalsh.com/jboyce@fosterwalsh.com
5

6  Attorneys for Plaintiffs DONALD L.COHN and KAREN S. COHN,
         husband and wife, as joint tenants
7

8              UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11 | DONALD L. COHN and KAREN S. COHN, | Case No. 09cv1656 WQH BLM
   | husband and wife, as joint tenants |

12 |                        | Honorable William Q. Hayes
   |            Plaintiffs, | **FIRST AMENDED COMPLAINT FOR**
13 |                        | **VIOLATION OF THE FEDERAL AND**
   | vs.                    | **CALIFORNIA SECURITIES LAWS**
14 |

15 | OPPENHEIMERFUNDS, INC.,
   | OPPENHEIMERFUNDS DISTRIBUTOR,
16 | INC., OPPENHEIME CHAMPION INCOME
   | FUND, CHARLES KANDILIS, WILLIAM L. | **DEMAND FOR JURY TRIAL**
17 | ARMSTRONG, JOHN V. MURPHY, AND
   | BRIAN W. WIXTED
18 |
19 |            Defendants.
20

21      Plaintiffs Donald L. Cohn and Karen S Cohn, husband and wife, as joint tenants,

22 (Collectively referred to simply as "Cohn") hereby allege as follows:

23                    **I.    INTRODUCTION**

24      1.    Cohn has filed this action as the result of the large financial losses he suffered when

25 he invested Two Million Dollars ($2,000,000) in the OppenheimerFunds' Champion Income Fund

26 ("Champion Fund") in October 2008, based upon the statements and assurances given directly to

27 Plaintiff Donald L. Cohn in a telephone call by Defendant Charles Kandilis who at the time was a

28 Vice President of OppenheimerFunds, Inc., and was familiar with the management of the

Champion Fund. The statements made by Kandilis to Donald L. Cohn, along with the written materials distributed by OppenheimerFunds, Inc to market the Champion Fund, were false, misleading and deceptive and caused financial losses to Cohn. As a direct result of the fraudulent and deceitful conduct by Defendants, Cohn has lost more than 1.2 million dollars of his original investment in the Champion Fund.

2.    Cohn brings several claims in this complaint pursuant to Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("1933 Act" or the "Securities Act") (15 U.S.C. Sections 77(k), 77(l), and 77(o)), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Securities Exchange Commission ("SEC") Rule 10b-5.

3.    Cohn also brings several claims in this complaint pursuant to *California Corporations Code* Sections 25400, 25401, 25500, 25501, and 25504 alleging state securities fraud under California law. Furthermore, Cohn asserts A claim for common law fraud under California law pursuant to *California Civil Code* Section 1709 ("Section 1709").

## II.    JURISDICTION AND VENUE

4.    This Court has jurisdiction over the subject of this matter under Section 22 of the Securities Act, Section 27 of the 1934 Act, and 28 U.S.C. Sections 1331, 1367, and the principles of pendant and supplemental jurisdiction.

5.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). Cohn resides in the Southern District of California.  Defendants do business in this district, and many of the acts giving rise to the violations of law complained of herein occurred in this district, such as the telephone call between Kandilis and Cohn and Foster where Foster and Cohn were in the district during the call, and the dissemination to shareholders of the registration statements and prospectuses for the Champion Fund.

6.    In connection with the acts alleged in this Complaint, Defendants used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

7.    Plaintiff Donald L. Cohn is 77 years old, and resides in La Jolla, California with his

1   wife, Plaintiff Karen S. Cohn.

2       8.      Defendant OppenheimerFunds, Inc. ("Oppenheimer" or "Manager") is the Manager

3   and investment advisor of the Champion Fund and chooses the Champion Fund's investments and

4   handles its day-to-day business.   Oppenheimer is a holding company that engaged in securities

5   brokerage, banking services, and related financial services through its subsidiaries.   Oppenheimer

6   is headquartered at 2 World Financial Center, 225 Liberty Street, New York, New York  10281-

7   1008.   Oppenheimer carries out its duties subject to the policies established by the Champion

8   Fund's Board of Trustees under an Investment Advisory Agreement.   Oppenheimer receives a

9   management fee as compensation for its services to the Champion Fund.

10      9.      Defendant OppenheimerFunds Distributor, Inc. ("Distributor"), is located 2 World

11  Financial Center, 225 Liberty Street, New York, New York 10281-1008, and is a subsidiary of

12  Oppenheimer, and was, during the relevant time period alleged in this Complaint, the principal

13  underwriter and distributor for shares of the Champion Fund, was trust agent for the purpose of the

14  continuous public offering the Champion Fund's shares, and assisted drafting and disseminating

15  the offering documents.

16      10.     Cohn is informed and believes and based thereon alleges that Defendant Charles

17  Kandilis ("Kandilis") was Vice-President Taxable Fixed-Income at Oppenheimer and/or

18  Distributor during the relevant time period until his departure in May 2009.  Kandilis identified

19  himself to Cohn as an officer of Oppenheimer familiar with the Champion Fund and its

20  management. Kandilis also sent out correspondence to Cohn regarding payment of Champion

21  Fund dividends on Distributor letterhead.

22      11.     Defendant William L. Armstrong ("Armstrong") is Chairman of the Board of

23  Trustees and signed or authorized the signing of each registration statement effective during the

24  relevant time period.

25      12.     Defendant John V. Murphy ("Murphy") is President and Principal Executive

26  Officer of the Champion Fund and a Trustee and signed or authorized the signing of each

27  registration statement effective during the relevant time period.

28      13.     Defendant Brian W. Wixted ("Wixted") is Treasurer and Principal Financial and

FIRST AMENDED COMPLAINT FOR VIOLATION OF
FEDERAL AND CALIFORNIA SECURITIES LAWS

1   Accounting Officer of the Champion Fund and signed or authorized the signing of each
2   registration statement effective during the relevant time period.

3          14.    The Defendants named above are all affiliated with each other and conduct
4   business under the umbrella of the "Oppenheimer" name, which is one of the largest asset
5   management organizations in the United States.

6          15.    Defendants Kandilis, Armstrong, Murphy, and Wixted, are referred to collectively
7   herein as the "Individual Defendants."

8          16.    At all relevant times alleged herein, Oppenheimer, the Distributor, and the
9   Individual Defendants, directly or indirectly, did control, and continue to control, the Champion
10  Fund, both individually and collectively.

11                    **IV.    FACTUAL ALLEGATIONS**
12  **The Champion Fund's Registration Statements, Prospectuses and SAIs**.

13         17.    The Champion Fund is open-ended, fixed-income mutual fund managed and
14  marketed by Defendant Oppenheimer.  The Champion Fund sold five classes of shares, A, B, C,
15  N, and Y, under the ticker symbols OPCX, OCHBX, OCHCX, OCHNX, and OCHYX.  The
16  allegations and claims asserted by Cohn in this Complaint concern only his purchase of Class A
17  shares of the Champion Fund.

18         18.    Defendants filed nearly identical Registration Statements and Prospectuses in 2006,
19  2007 and 2008 in connection with the continuous offerings of the Champion Fund's shares.

20         19.    The Registration Statements, Prospectuses, and Statements of Additional
21  Information ("SAIs") used through the relevant period of time in this Complaint to register and
22  offer the Champion Fund to Cohn contained untrue statements of material facts and omitted
23  material facts necessary to make the statements therein not misleading.  The Champion Fund is
24  simply referred to as the "Fund" in the excerpts of the Prospectuses set forth below.  While the
25  Prospectuses issued were not perfectly identical, they did contain many of the same untrue
26  statements and were rendered misleading by the same omissions. These include the following
27  statements:

28              a.    From the August 7, 2006 Prospectus:

WHAT ARE THE FUND'S INVESTMENT OBJECTIVES?  The Fund's primary objective is to seek a high level of current income by investing mainly in a diversified portfolio of high-yield, lower-grade, fixed-income securities that **the Fund's investment manager, OppenheimerFunds, Inc. (the "Manager"), believes do not involve undue risk.**  The Fund's secondary objective is to seek capital growth when consistent with its primary objective.

WHAT DOES THE FUND MAINLY INVEST IN?  The Fund invests mainly in a variety of high-yield fixed-income debt securities of domestic and foreign issuers for high current income.  These securities primarily include:

- Lower-grade bonds and notes of corporate issuers.
- Foreign corporate and government bonds.
- "Structured" notes.

Under normal market conditions, the Fund invests at least 60% of its total assets in high-yield, lower-grade, fixed-income securities, commonly called "junk" bonds.  Lower-grade debt securities are those rated below "baa" by Moody's Investors Service ("Moody's") or lower than "BBB" by Standard & Poor's Ratings Service ("S&P") or comparable ratings by other nationally-recognized rating organizations (or, in the case of unrated securities, determined by the Manager to be comparable to securities rated below investment grade).  See Appendix A to the Statement of Additional Information for a description of bond ratings.

The remainder of the Fund's assets may be held in other debt securities, cash or cash equivalents, in rights or warrants, or invested in common stocks and other equity securities when the Manager believes these investments are consistent with the Fund's objectives.  Investments in high-yield securities and equity securities may provide opportunities for capital growth while also providing income to the Fund.

The Fund's foreign investments currently focus on debt securities of issuers in developed markets.  The Fund also uses certain derivative investments, primarily "structured notes," to try to enhance income or to try to manage investment risks.  These investments are more fully explained in "About the Fund's Investments," below.

HOW DO THE PORTFOLIO MANAGERS DECIDE WHAT SECURITIES TO BUY OR SELL?  In selecting securities for the Fund, the Fund's portfolio managers analyze the overall investment opportunities and risks in different market sectors, industries and countries.  **The overall strategy is to build a broadly diversified portfolio of debt securities to help moderate the special risks of investing high-yield debt**

**instruments.** The portfolio managers currently use a "bottom up" approach, focusing on the performance of individual securities before considering industry trends. They evaluate an issuer's liquidity, financial strength and earnings power and also consider the factors below (which may vary in particular cases and may change over time), looking for:

- Changes in the business cycle that might affect corporate profits,
- Corporate sectors that in the portfolio managers' views are currently undervalued in the marketplace,
- Issuers with earnings growth rates that are faster than the growth rate of the overall economy,
- Securities or sectors that will help the overall diversification of the portfolio, and
- Issuers with improvements in relative cash flows and liquidity to help them meet their obligations.

The portfolio managers monitor changes in the factors listed above and any changes may trigger a decision to sell a security.

WHO IS THE FUND DESIGNED FOR? The Fund is designed primarily for investors seeking high current income from a fund that invests mainly in lower-grade domestic and foreign fixed-income debt securities. Those investors should be willing to assume the greater risks of short-term share price fluctuations that are typical for a fund that invests mainly in high-yield domestic and foreign fixed-income debt securities, which also have special credit risks. Since the Fund's income level will fluctuate, it is not designed for investors needing an assured level of current income. The Fund is intended to be a long-term investment and may be appropriate as a part of a retirement plan portfolio. The Fund is not a complete investment program.

b.   The January 26, 2007, and January 28, 2008, Prospectuses contained disclosures similar to the 2006 Prospectus:

WHAT ARE THE FUND'S INVESTMENT OBJECTIVES? The Fund's primary objective is to seek a high level of current income by investing mainly in a diversified portfolio of high-yield, lower-grade, fixed-income securities that **the Fund's investment manager, OppenheimerFunds, Inc. (the "Manager"), believes does not involve undue risk.** The Fund's secondary objective is to seek capital growth when consistent with its primary objective.

WHAT DOES THE FUND MAINLY INVEST IN? The Fund invests in a variety of high-yield, fixed-income securities and related instruments. These investments primarily include:

- Lower-grade corporate bonds.

FIRST AMENDED COMPLAINT FOR VIOLATION OF
FEDERAL AND CALIFORNIA SECURITIES LAWS

- Foreign corporate and government bonds.
- Swaps, including single name and index-linked credit defaults swaps.

Under normal market conditions, the Fund invests at least 60% of its total assets in high-yield, lower-grade, fixed-income securities, commonly called "junk" bonds. Lower-grade debt securities are those rated below "Baa" by Moody's Investors Service ("Moody's") or lower than "BBB" by Standard & Poors Ratings Service ("S&P") or comparable ratings by other nationally-recognized rating organization (or, if unrated, debt securities determined by the Manager to be comparable to securities rated below investment grade). See Appendix A to the Statement of Additional Information for a description of bond ratings. Investments in high-yield securities may provide opportunities for capital growth while also providing income to the Fund.

The remainder of the Fund's assets may be invested in other debt securities, common stocks (and other equity securities), or cash equivalents when the Manager believes these investments are consistent with the Fund's objectives.

The Fund may invest in securities of foreign issuers. The Fund currently focuses on debt securities of foreign issuers in developed markets. The Fund also uses certain derivative investments to try to enhance income or to try to manage investment risks. These investments are more fully explained in "About the Fund's Investments," below.

HOW DO THE PORTFOLIO MANAGERS DECIDE WHAT SECURITIES TO BUY OR SELL? In selecting securities for the Fund, **the overall strategy is to build a broadly diversified portfolio to help moderate the special risks of investing in high-yield debt instruments.** The portfolio managers currently use a "bottom up" approach, focusing on the performance of individual securities before considering industry trends. They evaluate an issuer's liquidity, financial strength and earnings power. The Fund's portfolio managers also analyze the overall investment opportunities and risks in different market sectors, industries and countries. The Fund's portfolio managers also analyze the overall investment opportunities and risks in different market sectors, industries and countries. The Fund's portfolio managers consider some or all of the factors below (which may change over time):

- Issuers with earnings growth rates that are faster than the growth of the overall economy,
- Issuers with improvements in relative cash flows and liquidity to help them meet their obligations,
- Corporate sectors that in the portfolio managers' views are currently undervalued in the marketplace,

- Changes in the business cycle that might affect corporate profits, and
- Securities or sectors that will help the overall diversification of the portfolio.

The portfolio managers monitor changes in the factors listed above. Any changes may trigger a decision to sell a security.

WHO IS THE FUND DESIGNED FOR? The Fund is designed primarily for investors seeking high current income from a fund that invests mainly in lower-grade domestic and foreign fixed-income securities. Those investors should be willing to assume the greater risks of short-term share price fluctuations and the special credit risks that are typical for a fund that invests mainly in lower-grade domestic and foreign fixed-income securities. Since the Fund's income level will fluctuate, it is not designed for investors needing an assured level of current income. The Fund is intended to be a long-term investment and may be appropriate as a part of a retirement plan portfolio. The Fund is not a complete investment program.

20.     Evidencing the belief by advisors (and even Oppenheimer) that the Champion Fund was to be conservative in its credit posture was the fact that other conservative Oppenheimer funds maintained holdings in the Champion Fund. For example, the $290 million Oppenheimer Conservative Investor Fund had 4% of its holdings in the Champion Fund through November 2008. (The Oppenheimer Conservator Investor Fund is down almost 40% this year, making it one of the worst-performing conservative allocation funds followed by fund tracker Morningstar Inc.). Indeed, more than 10% of the Champion Fund also was recently held by other OppenheimerFunds offerings.

21.     The November 26, 2007 SEC form N-CSR also provided the following:

MANAGEMENT'S DISCUSSION OF FUND PERFORMANCE. Over the 12-month period ended September 30, 2007, Oppenheimer Champion Income Fund's Class A shares (without sales charge) posted annualized returns of 7.51% that was in line with those of the Fund's primary benchmark, the Merrill Lynch High Yield Master Index, which returned 7.63%. We attribute these slightly disappointing performance results to two primary factors. First, despite generally favorable conditions for the high-yield sector in the first half of the reporting period, the overall market backdrop that prevailed over the second half of the Fund's fiscal year was dominated by investors' preference for only the highest-rated fixed-income securities, particularly U.S. treasuries. As a result, most non-Treasury, or "spread" securities suffered from February through the end of the reporting period, as yield spreads widened considerably, particularly for high-yield

credits. With yield spreads at significantly wide levels, and with technical factors such as reduced investor demand working against the sector at-large, most high-yield credits found it difficult to appreciate in price regardless of their generally sound fundamentals.

**Second, while we continue to redirect the Fund's credit-quality profile toward higher-quality bias by reducing the number of lower-quality credits in the Fund's portfolio, our shrinking but still-present emphasis on lower-quality bonds hurt performance in a period marked by investors' aversion to risk.**

**That said, several factors worked in our favor this period, giving rise to our generally optimistic outlook for the Fund's long-term performance potential. First, prudent management of the Fund's duration, or exposure to interest-rate risk, provided a key benefit to performance for the period. For example, our less-than-market interest-rate sensitivity added value through mid-February, and in particular, in January, when yields rose in response to favorable economic data and a brightened outlook for the U.S. economy.**

As the fiscal year progressed, we continued to adjust the size of our short duration position according to prevailing conditions and our proprietary models. By June, we had moved to a neutral duration versus the benchmark, since at that time, we believed longer-term forecasts as implied by the yield curve had transitioned to more closely align with actual fundamentals. Then, in July, a surge of delinquencies in the sub-prime mortgage market prompted a wave of volatility and investor confidence shattered. Yields fell markedly, and we were convinced that the markets were assuming an overly negative long-term outlook for interest rates. In light of that analysis, we resumed our short duration positioning over the benchmark. While our decision to move back to a less-than-market interest-rate sensitivity in July cost us some marginal performance when rates continued to fall through the end of the period, the impact of this detractor was negligible, and the positive impact our overall interest-rate strategy made to the Fund's performance for the 12-month period eclipsed those losses.

Next, our decision to remain overweighted in our exposure to highly rated telecom bonds served us well given this sector's strong performance over the period. Likewise, our consistent emphasis on gaming-related bonds has provided a steady boon to performance. Meanwhile, the Fund's underweighted exposure to bonds issued by companies in the homebuilding sector also boosted our performance relative to the benchmark, since this sector has continued to stagnate along with the overall U.S. housing market.

Individual security selection within the health care sector added to

FIRST AMENDED COMPLAINT FOR VIOLATION OF
FEDERAL AND CALIFORNIA SECURITIES LAWS

performance in the first half of the period, with many of our select holdings in this area providing attractive yield and relative price stability. Finally, our decision to emphasize domestic auto-related bonds, particular Ford Motor Co. and General Motors Corp., which led the consumer-cyclicals sector in terms of performance in the first half of 2007, benefited the Fund's returns in the first half of the period, particularly on a relative basis.

22.     The Prospectuses were negligently prepared; and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and were not prepared in accordance with the rules and regulations governing their preparation.

23.     In late August 2008, the Champion Fund filed its Quarterly Schedule of Portfolio Holdings with the SEC on form N-Q for the period ending June 30, 2008. The N-Q disclosed the Champion Fund's increase in exposure to the commercial real estate market as well as to Lehman and AIG paper.

24.     Thereafter, by September 12, 2008, Lehman was on the verge of collapse and the situation at AIG was growing increasingly precarious. A few days later, on September 15, 2008, Lehman filed for bankruptcy. The next day AIG announced it had received a bail out from the U.S. Government. In the wake of the collapse of Lehman and AIG, shares of the Champion Fund fell given the Fund's exposure to both of these companies. The Champion Fund's Class A shares closed on September 12, 2008 at $7.47 per share. By the end of September, the Champion Fund had lost 16% of its value, closing $6.26 per share.

25.     Over the course of the next several months, the Champion Fund's investment portfolio began to rapidly deteriorate and investors began to realize the extent of the Champion Fund's exposure to derivatives and other high risk investments in its true leverage position. The Fund continued its collapse and by the end of October 2008, the fund had lost another 37% of its value, closing at $3.95 per share.

26.     In November 2008, the U.S. Government announced that its $700 billion economic rescue program would not include buying toxic debt such as the type of debt held by the Fund as planned. Further, in November 2008, speculation increased that the already troubled commercial real estate market would be the next to meltdown as delinquencies in the market rose sharply. As

a result, OppenheimerFunds was forced to make an additional investment of $150 million into the Fund to boost liquidity.  The fund lost an astounding 56% of its value in November 2008, closing the month at $1.75 per share, trading as low as $1.36 per share during the month.

27.    On December 2, 2008, the Fund filed with the SEC its 2008 Annual Report for fiscal year ending September 31, 2008 on Form N-CSR.  The Annual Report provided additional details as to the extent of the Fund's derivative exposure and leverage position and further disclosed the Fund's purchase of Lehman bonds during its fourth quarter.  The Annual Report provided in part:

> **Management's Discussion of Fund Performance.**   For the 12-month period ended September 30, 2008, the Fund's Class A shares (without sales) returned -27.70%, underperforming the Merrill Lynch High Yield Master Index and the Lehman Brothers Credit Index, which returned -11.58% and -4.79%, respectively, during the same time frame.

> **For the fiscal year ended September 30, 2008, several factors detracted from Oppenheimer Champion Income Fund's returns and materially contributed to the Fund's underperformance versus its benchmarks. To begin, our decision to gradually improve the overall credit quality of the Fund's portfolio hurt us.  In the beginning of the fiscal year, high-yield credit spreads were "tight," or narrow relative to like-duration Treasuries.  At that time, we believed that the high-yield market was not adequately compensating investors for taking on incremental risk. Given this conviction, plus our unwavering commitment to avoid undue risk, we began trimming our high-yield risk exposure and instead, worked to increase our exposure to higher-quality credits.   We accomplished this by adding to the portfolio's higher-grade, longer-duration financials bonds, highly rated non-agency residential mortgages and equally highly rated commercial mortgage-backed securities.**

> **Despite the fact that the overall credit quality of our holdings improved, this strategy worked against us.  For one, the ongoing credit crisis propelled investors to eschew virtually all mortgage-related risk, regardless of credit quality, compressing returns in the residential non-agency mortgage arena—even for securities backed by high-quality borrowers with AAA-ratings.**

> **Additionally, our decision to emphasize financial bonds of longer durations hurt us in two respects:  financial-related credit suffered substantially by association as some of Wall Street's major banking institutions declared or neared bankruptcy; and, longer-maturity**

**bonds weathered relatively greater price volatility in an increasingly turbulent market.   Finally, although commercial mortgage-backed securities (CMBS) bear little resemblance to residential mortgage-backed securities in terms of current delinquencies and potential for impairment, they too were shunned by investors due to perceived association with the residential mortgage crisis.   And, despite a brief rally for CMBS in the second quarter 2008, they soon fell and lagged markedly for the period at large.   With all three of these market segments sharply underperforming, our emphasis in these areas placed a substantial drag on Fund performance.**

Next, our decision to underweight our exposure to high-yield credits also cost us returns.   Ironically, despite a widespread flight-to-quality by investors who turned away from perceived risk, lower-quality, high-yield credit suffered less on a relative basis than some higher-quality names, largely due to sector association.

Finally, our interest-rate positioning detracted from performance, but only slightly.   We remained neutral in our duration, or interest-rate sensitivity, based on our belief that the market's expectations for rates during the period were roughly in line with actual economic fundamentals.   Fortunately, this strategy only minimally impacted returns for the Fund.

Notwithstanding the Fund's disappointing performance this period, three factors worked in our favor.   Our decision to remain underweighted in our exposure to both retail/consumer credit as well as cyclical names, such as metals, mining and paper company debt, helped, since these areas lagged.   Similarly, our overweight exposure to specialty chemicals at the expense of commodity chemicals also added to our returns, since this niche of the credit market exhibits relatively less sensitivity to current conditions.

28.   Then, on December 10, 2008, *Bloomberg* published an article entitled "Oppenheimer High-Yield Fund Battered by Mortgage-Backed Debt."   The article, which confirmed investors' prior fears, stated in part:

**Oppenheimer Champion Income Fund fell 55 percent in the past month after the U.S. Treasury abandoned plans to buy troubled mortgages from banks, making it the worst-performing U.S. bond fund since September.**

**The $627 million high-yield fund, run by New York-based OppenheimerFunds Inc., plunged on wrong-way bets that prices on securities tied to commercial mortgages would increase. Instead, prices fell after Treasury Secretary Henry Paulson said Nov. 12 that government's $700 billion economic-rescue program wouldn't include buying toxic debt as first planned.**

"I don't think the managers saw it as an aggressive strategy, **but there were some risks that weren't clearly appreciated,**" said Miriam Sjoblom, a fund analyst with Morningstar Inc. in Chicago. "The big question right now is: Will the fund recover quickly, or will it take years?"

Top-rated commercial-mortgage bonds, the largest part of the $800 billion market, tumbled 10 percent last month, according to Merrill Lynch & Co.'s CMBS Fixed-Rate AAA Rated index. That compares with an 8.5 percent drop in October, the previous worst decline since at least 1998.

The spread on AAA rated commercial mortgage-backed securities hit a record 15.29 percentage points more than benchmark rates on Nov. 20, according to Bank of America Corp. data. The gap has since fallen to 10.17 percentage points.

Corporate Investment

**Managed by a five-member team led by Angelo Manioudakis, Champion Income has lost 77 percent since September, the biggest decline by any bond fund tracked by Morningstar. OppenheimerFunds has pumped $150 million into the fund so the fund does not have to sell illiquid securities, Manioudakis said in an interview.**

"It was the perfect storm," he said. "Traditional high-yields were experiencing a decline in prices and spreads" on commercial-backed mortgage securities "widened to unprecedented levels."

OppenheimerFunds, owned by Massachusetts Mutual Life Insurance Co., manages more than $150 billion.

Champion Income can invest as much as 40 percent of assets in areas where it sees "strong opportunity," according to fund marketing documents. The fund's prospectus allows the managers to invest in swaps and other derivatives. The total-return swap contracts held by Champion Income that were backed by commercial mortgages had a notional value of $1.05 billion as of Sept. 30, according to a Dec. 2 regulatory filling.

Under those swaps, the fund would have profited if the spread, or the difference between benchmark interest rates and mortgage-backed bonds, had narrowed. Instead, mortgage bonds posted a record decline in November, raising the gap to an all-time high.

'Ridiculous Levels'

Manioudakis said declines in the market for mortgage-backed securities has brought prices for senior debt to "ridiculous levels," which will help the fund when prices rebound.

Oppenheimer Champion Income entered into total-return swaps with counterparties including Goldman Sachs Group Inc. and Citigroup Inc. as of Sept. 30.

According to the terms of those agreements, if credit spread rose on certain indexes of commercial mortgage-backed securities, the fund would pay the counterparties the spread plus as much as 2.5 percent of the notional value of the bonds.

Commercial mortgage delinquencies rose in November and will climb as the economy slows, according to Barclays Plc. Payments more than 60 days late on commercial real estate loans that were bundled together and sold as bonds increased to 0.69 percent last month, compared with 0.57 percent in October and 0.51 percent in September, Barclays data show.

High-Yield Fall

High-yield bond funds that invest in corporate debt have tumbled 31 percent this year after a credit freeze that started last year with a surge in subprime-mortgage defaults. The bankruptcy in September of Lehman Brothers Holdings Inc. accelerated bond-market declines, with investors shunning all but the safest government-backed debt.

High-yield, or junk, bonds are rated below Baa3 by Moody's Investors Service and less than BBB- at Standard & Poor's.

Companies with junk credit ratings have been mostly unable to sell bonds, causing yields over benchmark rates on their debt to double since Lehman filed for bankruptcy to more than 20 percentage points for the first time, according to Merrill Lynch index data.

**Oppenheimer Champion fund had about 61 percent of assets in corporate rated "B" or below by Standard & Poor's. That compares with 79 percent of assets held in debt rated below "B" by rival high-yield bond funds, according to Morningstar.**

**Even with higher-quality investments, the swap arrangements dragged down the Oppenheimer fund, Morningstar's Sjoblom said. The average high-yield bond fund has declined 29 percent in the past three months, Morningstar data show.**

Champion Income has lost 79.1 percent this year, a record eclipsed only by

FIRST AMENDED COMPLAINT FOR VIOLATION OF
FEDERAL AND CALIFORNIA SECURITIES LAWS

Regions Morgan Keegan Select High Income Fund.  That fund, managed by Memphis, Tennessee-based Morgan Asset Management Inc., has declined 79.2 percent on below-investment-grade bonds.  The performance has prompted investor lawsuits.  Morgan Asset Management is the investment advisory unit of Regions Financial Corp., based in Birmingham, Alabama.

29.     On December 10, 2008, the Champion Fund closed at $1.67 per share, a decline of 83% from its Class Period high of $9.71 per share in May 2007.

30.     Defendants positioned the Champion fund as a conservative high income fund or at least a high income fund that was not dramatically riskier than the high income/intermediate fund peer group and portrayed the fund as a diversified, higher-yielding Champion Fund that might be appropriate as part of a retirement plan portfolio.

31.     However, Oppenheimer's portfolio of high-risk investments for the Champion Fund went far beyond the commercial mortgage backed securities described above. Oppenheimer also gambled recklessly by investing extensively in products such as total-return swaps ("TRS"), and credit-default swaps ("CDS").

32.     A TRS may be described as a highly illiquid, speculative and complex agreement between parties to exchange cash flows in the future based on how a set of securities perform.  In this case, the Champion Fund had bet that top-rated CMBSs would rally in 2008, but the Fund lost that bet, to the substantial detriment of investors.

33.     Similarly, Oppenheimer concentrated a substantial portion of the Champion Fund portfolio in CDSs in 2007 and 2008. News regarding CDSs over the past year has placed this term in the national lexicon along with "bail-out", "systemic failure", and "AIG."  A CDS is designed as a hedge against a credit risk. It is an agreement between parties where a buyer pays premiums to the seller of the CDS in return for the seller's agreement to pay buyer in the event of a default on the underlying securities.  Oppenheimer continued to sell CDSs as the CDS market, long after the market first showed signs of stress and illiquidity, and ultimately collapsed.

**The False and Deceptive Misstatements by Kandilis to Cohn and Foster.**

34.     In October 2008, Plaintiff Donald L. Cohn was considering making an investment of $2,000,000 in the Champion Fund.  Several years previously Cohn had invested successfully in the Champion Fund.  Cohn knew the Champion Fund as a high-yield, high-quality corporate bond

1    fund which historically traded in a stable, fairly narrow price range for Class A shares.

2        35.    Cohn discussed the prospect of investing his funds again on a short-term basis in

3    the Champion Fund with his stockbroker, Don Foster, at Girard Securities, Inc. ("Girard

4    Securities") in San Diego, California.  Foster made a review of the OppenheimerFunds Portfolio

5    Quarterly Updates available at the time pertaining to the Champion Fund, and other general

6    sources, and thereafter he and Cohn elected to make further inquiry before making a final decision

7    on Cohn's potential investment.

8        36.    Both Foster and Cohn noted at the time, that although the value of the Champion

9    Fund had remained relatively stable in prior years, the value of the shares in the Champion Fund

10   had decreased in the summer or early fall of 2008.  As a result of this decline in value, Cohn and

11   Foster decided to contact Oppenheimer directly, as manager of the Champion Fund, regarding the

12   decreases in the share values and the prospects for Cohn's investment in the Champion Fund.

13       37.    Foster had worked with Timothy O'Connoll, who served as a wholesaler for

14   Oppenheimer.  As a result of the size of Cohn's potential investment, Foster arranged with

15   O'Connoll for Cohn to have direct access to senior personnel at Oppenheimer regarding his

16   potential investment in the Champion Fund.

17       38.    On or about October 13, 2008, Plaintiff Donald L. Cohn and Foster participated in

18   a conference call with Defendant Kandilis at Oppenheimer regarding the Champion Fund.  During

19   the conference call, Kandilis identified himself as a Vice-President for Oppenheimer and as a

20   officer who was familiar with the Champion Fund and its management.  Kandilis also assured

21   Cohn and Foster that as an Oppenheimer officer, he could respond to any inquiries by Cohn or

22   Foster regarding the Champion Fund and its management by Oppenheimer.

23       39.    Cohn is informed and believes and based thereon alleges that at the time of the

24   October conference call, Kandilis was Vice-President Taxable Fixed-Income at Oppenheimer

25   which managed the Champion Fund; and that Kandilis had served in this capacity for

26   Oppenheimer between 2002 until Kandilis' employment with Oppenheimer terminated in May

27   2009.

28       40.    During the October conference call with Kandilis, Cohn and Foster both confirmed

that the purpose of their telephone call was to obtain information regarding the decreases in price of the Champion Fund shares over the previous several months.   Cohn and Foster wanted to confirm with Oppenheimer that Cohn's investment would be safe prior to investing $2,000,000 into the Champion Fund.   Kandilis provided the necessary assurances on behalf of Oppenheimer to Cohn and Foster.

41.     Kandilis stated that the Champion Fund was invested in two types of securities, high-yield and high-quality corporate bond and collateralized mortgage obligations secured by AAA rated commercial real estate such as Nordstrom properties.   Kandilis stated to Cohn and Foster that the current value of the Champion Fund had been driven down primarily as a result of a small investment in a Lehman Brothers product and a default by Lehman Brothers.   As to the mortgage-backed securities, Kandilis stated that the book value of the commercial property securing the debt exceeded the book value of the obligations, and presented no undue risk whatsoever.   Kandilis further stated that the Champion Fund was healthy and that the only loss it had suffered was from the Lehman Brothers' default that approximately a 3% impact on share price in the Champion Fund.   Kandilis also most emphatically stated that the Champion Fund share price was now at a point "that an Armageddon would have to occur to lose monies in the funds, if Cohn invested at the current price."

42.     The telephone conference between Kandilis, Cohn, and Foster did not take a great deal of time, but in his statements to Cohn and Foster, Kandilis was adamant that the Champion Fund was "a safe investment."   Kandilis made no mention of any swaps, credit default swaps, or other any other investment by the Champion Fund.

43.     After reviewing the public information regarding the status and nature of the Champion Fund, and the assurances provided by Kandilis, and in reliance upon Kandilis' representations regarding the safety and overall health of the Champion Fund, Cohn made two trades.   First, Cohn invested $1,000,000 into the Champion Fund, buying Class A shares on October 14, 2008.   The unit price on October 14, 2008 was $4.64. This investment was held in an account (Account No. KL9-651052) [the "Trust Account"] at Girard Securities, in the name of Donald L. Cohn and Karen S. Cohn as Trustees of the Donald L. and Karen S. Cohn Trust dated

1 | June 9, 1992 (the "Trust").

2 | 44. Second, on October 15, 2008, Cohn put an additional $1,000,000 into the
3 | Champion Fund, purchasing Class A shares. The unit price on October 15, 2008 was $4.33. This
4 | investment also was held in the Trust Account at Girard Securities. In August, 2009, the Trust
5 | transferred all of the Champion Fund shares from the Trust Account to another account (Account
6 | No. KL9-000531) at Girard Securities maintained in the name of "Donald L. Cohn and Karen S.
7 | Cohn, husband and wife, as joint tenants" (the "Account"). Furthermore, in August 2009, the Trust
8 | transferred and assigned to Donald L. Cohn and Karen S. Cohn, husband and wife, as joint
9 | tenants, the right to file and maintain this action, and to prosecute the claims asserted herein
10 | against Defendants.

11 | 45. The Management Commentaries and Annual Report for the Champion Fund dated
12 | September 30, 2008, state that the Champion Fund's primary objective is to seek a high level of
13 | current income by investing mainly in a diversified portfolio of high-yield, lower-grade, fixed-
14 | income securities that the Fund's Investment Manager Oppenheimer believed did not involve
15 | undue risk. The Champion Fund's secondary objective is to seek capital growth when consistent
16 | with its primary objective. Oppenheimer's discussion of the Champion Fund's performance for
17 | the twelve month period ending September 30, 2008, Oppenheimer stated that it had a
18 | "unwavering commitment to avoid undue risk."

19 | 46. The September 30, 2008 date of the Annual Report is misleading in that
20 | Oppenheimer did not deliver its management commentaries and Annual Report to Cohn until late
21 | January or early February 2009, several months after he made his $2,000,000 investment.

22 | 47. Despite the several representations and assurances made by Oppenheimer's Vice-
23 | President Kandilis, after Cohn invested his funds, the value of the Champion Fund began
24 | immediately to spiral downward. By the end of October 2008, Cohn's $2,000,000 investment had
25 | been reduced to $1,763,600, and by the end of the calendar year 2008, his investment had been
26 | reduced further to $770,000. During the first quarter 2009, the investment in the Champion Fund
27 | sustained additional losses to an investment value equal to $642,912 and currently the value of our
28 | client's investment in the Champion Fund equals $732,205.

48.     The Annual Report and the Registration Statements and the accompanying financial statements indicate that despite its assurances of continued vigilance, Oppenheimer had abandoned what it had stated was an unwavering commitment to avoid undue risk.  The Annual Report delivered in February 2009, presented a much more dire picture of the Champion Fund than had been painted by Kandilis in October 2008.  Whereas the Champion Fund investment portfolio was a traditional high yield fund in years past, in 2007 and 2008, the Champion Fund changed investment philosophy.  Oppenheimer's managers sought high-risk, more speculative investment products --- CDSs, TRSs, and interest rate swap contracts --- products which exposed its investors and Cohn in particular, to an undue risk of loss of which they had no knowledge, and which they had sought to avoid.

49.     A CDS trader must appreciate the risk associated with assuming the risk of a default, and Oppenheimer apparently elected not to consider the high risks associated with CDSs or TRSs, or at least disclose the investments to the public or parties who had invested in the Champion Fund. Compounding the problem, Oppenheimer made repeated bad investments to recoup bad investments with respect to the Champion Fund.  The scope of this high-risk activity by the Champion Fund's manager is illustrated in the financial statements attached to the 2008 Annual Report.  The 2008 Annual Report shows that the Champion Fund was also actively trading in futures contracts, TRSs, CDSs, and interest rate swap contracts.

50.     On or about December 30, 2008, Kandilis sent a letter on Distributor letterhead addressed to the valued partners of the OppenheimerFunds informing them that the Champion Fund would be paying a reduced dividend. Kandilis explained in his letter that the reduction in dividends was due to two conditions: (a) Oppenheimer's purchase of $150 million of shares of the Champion Fund to provide additional liquidity; and (b) Oppenheimer's implementation of a change in its portfolio strategy and investment positioning expected to reduce the income generated by the Champion Fund. However, in his letter, Kandilis did not describe what the changes in the portfolio strategy and investment positioning were, and did not mention that Oppenheimer's managers had invested heavily in high-risk, more speculative investment products --- CDSs, TRSs, and interest rate swap contracts --- for the Champion Fund, which had resulted in

1 | substantial losses.

2 | 51. None of these facts were disclosed to Cohn by Charles Kandilis, or any other

3 | manager, representative, or employee of Oppenheimer, Inc. Cohn first learned these facts in

4 | January or February 2009. Had he known that the Champion Fund had invested in futures

5 | contracts, TRSs, CDSs, or interest rate swap contracts, Cohn would not have invested any monies

6 | in the Champion Fund in October 2008.

7 | 52. Cohn was lulled into mistakenly believing that the risks associated with the

8 | Champion Fund investment he made in 2008 were comparable r to the investment risk he had

9 | taken several years earlier investing in the same Champion Fund. Further, the statements made by

10 | Charles Kandilis during the conference call with Foster and Cohn, led Cohn to believe that his

11 | $2,000,000 would not be exposed to undue risk – it would be a safe investment. However, Cohn

12 | was duped, and has suffered a huge loss as a result of the deceitful and fraudulent representations

13 | by Charles Kandilis.

**COUNT I**
**VIOLATIONS OF SECTION 11 OF THE 1933 ACT**
**AGAINST ALL DEFENDANTS**

53. Plaintiffs refer to the allegations set forth in the preceding paragraphs 1 through 52, inclusive, of this complaint, and incorporates these allegations herein as though set forth fully, except to the extent that any allegations above contain facts which are unnecessary or irrelevant for purposes of stating a claim under Section 11 of the Securities Act, including allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the Section 11 defendants, other than strict liability or negligence.

54. This count is brought pursuant to the Section 11 of the 1933 Act, 15 U.S.C. Section 77(k), and is asserted against all defendants.

55. The Registration Statements for the Champion Fund contain untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and/or omitted to stated material facts required to be stated therein.

56. Defendants were responsible for the contents and dissemination of the Registration Statements.

57.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements in the Registration Statements were true and without omissions of any material facts and were not misleading.

58.     By reason of the conduct alleged herein, each Defendant violated, and/or controlled the person who violated Section 11 of the 1933 Act.

59.     Plaintiffs acquired Champion Fund shares pursuant to the Registration Statements.

60.     Plaintiffs have sustained damages.  The value of the Champion Fund shares has declined substantially subsequent to and due to defendants' violations.

61.     At the time of the purchase of the Champion Funds shares, Cohn was without knowledge of the facts concerning the untrue statements or omissions herein and could not have reasonably discovered those facts prior to approximately February 2009.  Less than on year has elapsed from the time Cohn could discover or reasonably could have discovered the facts upon which this Complaint is based to the time that Cohn filed this Complaint.  Less than three years have elapsed between the time that the securities upon which this count is brought were offered to the public and the time Cohn filed this Complaint.

**COUNT II**
**VIOLATIONS OF SECTION 12(A)(2) OF THE 1933 ACT**
**AGAINST ALL DEFENDANTS**

62.     Cohn refers to each and every allegation and claim alleged hereinabove in paragraphs 1 through 52, inclusive, and 54 through 61, of this complaint, and by this reference incorporates each such allegation and claim as though fully set forth, except to the extent any allegations above contains facts which are unnecessary or irrelevant for purposes of stating a claim under Section 12 including allegations that might be interpreted to sound in fraud or relating to any state of mind on the part of the Section 12 defendants, other than strict liability or negligence.

63.     This count is brought pursuant to Section 12 of the 1933 Act, 15 U.S.C. Section 77(l), and is asserted against all Defendants.

64.     Defendants offered and sold a security, namely shares of the Champion Fund's Class A common stock by means of a prospectus or were controlling persons of the Champion Fund or of those who offered and sold the Champion Fund's shares.  This prospectus contained

1  untrue statements of material facts and omitted to state material facts necessary in order to make

2  the statements in light of the circumstances under which they were made, not misleading, which

3  statements and omissions Defendants knew, or in the exercise of reasonable care, Defendants

4  should have known, were false or material facts which were required to be disclosed to avoid the

5  representations which were made from being misleading.

6      65.     Defendants actively solicited the sale of the Champion Fund's shares to serve their

7  own financial interests.

8      66.     Cohn did not know that the representations made in connection with the

9  distribution to him by Defendants regarding the matters described above were untrue and did not

10  know the above described material facts that were not disclosed.

11     67.     As a result of the matter set forth herein, pursuant to Section 12(a)(2) of the

12  Securities Act, Cohn is entitled to recover the consideration paid for such security with interest

13  thereon, less the amount of any income received thereon, upon tender of such security, or for

14  damages if he no longer owns such shares.

15     68.     Cohn hereby tenders his shares in the Champion Fund.

16     69.     Defendants are liable to Cohn pursuant to Section 12(a)(2) of the Securities Act as

17  sellers of the Champion Fund's shares.

**COUNT III**
**VIOLATIONS OF SECTION 15 OF THE 1933 ACT**
**AGAINST ALL DEFENDANTS**

20     70.     Plaintiffs refer to the allegations contained in paragraph 1 through 52 of this

21  Complaint hereinabove, and incorporates these allegations herein as though fully set forth, except

22  as to the extent any allegations above contain facts which are unnecessary or irrelevant for

23  purposes of stating a claim under Section 15, including allegations that might be interpreted to

24  sound in fraud or relating to any state of mind on the part of Defendants, other than strict liability

25  or negligence.

26     71.     This count is brought pursuant to Section 15 of the 1933 Act, 15 U.S.C. Section

27  77(o), and is asserted against all defendants.

28     72.     Each of the Defendants was a control person of the Champion Fund, or the

Manager, or the Distributor, by virtue of his or her position as a senior officer of the Champion Fund or the Oppenheimer entities. The individual defendants each had a series of direct and/or indirect business and/or personal relationship with other officers and/or major shareholders of the Manager and Distributor of the Champion Fund.

73. Each of the Defendants was a culpable participant in the violations of Sections 11 and 12 of the 1933 Act alleged in Counts I and II above, based on there having signed or authorized the signing of the Registration Statements and having otherwise participated in the process which allowed the offerings to be successfully completed, or having participated in the offer or sale of the shares of the Champion Fund.

## COUNT IV
### VIOLATIONS OF SECTION 10(b) OF THE 1934 ACT
### AGAINST ALL DEFENDANTS

74. Cohn refers to the allegations in paragraphs 1 through 52, inclusive, of the Complaint hereinabove, and by this reference incorporates these allegations herein as though fully set forth.

75. This count is asserted against Oppenheimer, the Champion Fund, Armstrong, Murphy, Wixted, and Kandilis for violations of Section 10(b) of the 1934 Act, 15 U.S.C. Section 78(j)(b), and Rule 10b-5, 17 CFR Section 240.10b-5 promulgated thereunder.

76. During the relevant time period alleged in the Complaint, Oppenheimer, the Champion Fund, Armstrong, Murphy, Wixted, and Kandilis, individually and in concert with others, directly and indirectly, by use of means or instrumentalities of interstate commerce and/or of the mails and a national securities exchange, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Cohn; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstance under which they were made, not misleading; made the above statements with a reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purpose and sale of the Champion Fund shares, which were intended to, and, during the relevant period alleged in this Complaint, did: (a) deceive the investing public, including Cohn, regarding, and among other things, the Champion Fund's

1   compliance with its stated investment policy; and (b) cause Cohn to purchase or continue to hold

2   Champion Fund shares at an artificially inflated price.

3       77.    Defendants Armstrong, Murphy, Wixted, and Kandilis are liable as direct

4   participants in the wrongs complained of in this count.  With their positions of control and

5   authority as officers of the Champion Fund and Oppenheimer, the individual defendants named in

6   this count were able to control and did control the content of the public statements contained

7   therein and, with knowledge or reckless disregard, caused the above complained of public

8   statements to contain misstatements and omissions of material facts as alleged herein.

9       78.    Defendants Oppenheimer and the Champion Fund are liable for each of the

10  materially false and misleading statements set forth therein, including each of the statements of the

11  individual defendants, under the principles of *respondeat superior.*

12      79.    Cohn has suffered damages in that, in reliance on the integrity of the market, he

13  paid artificially inflated prices for or continued to hold Champion Fund shares.  Cohn would not

14  have purchase or continued to hold Champion Fund shares at the prices he paid, or at all, if he had

15  been aware that the market prices had been artificially and falsely inflated by defendants'

16  misleading statements.

17      80.    Champion Fund, Oppenheimer, and defendants Armstrong, Murphy, Wixted, and

18  Kandilis, acted with scienter in that each knew that the public documents and statements issued or

19  disseminated in the name of the Fund were materially false and misleading; knew that such

20  statements or documents would be issued or disseminated to the investing public; and knowingly

21  and substantially participated or acquiesced in the issuance or dissemination of such statements or

22  documents as primary violations of the Federal Security laws.  Furthermore, Kandilis in his

23  telephone conference call with Foster and Cohn in October 2008, directly and unequivocally

24  assured Cohn and Foster of the safety of his investment in the Champion Fund.

25  

**COUNT V**
**VIOLATIONS OF SECTION 20(A) OF THE 1934 ACT**
**AGAINST ALL DEFENDANTS**

26

27      81.    Plaintiffs refer to the allegations in paragraphs 1 through 52, inclusive, of this

28  Complaint set forth hereinabove, and by this reference incorporates these allegations herein as

1   though fully set forth.

2       82.     This count is asserted against Defendants Oppenheimer, Armstrong, Murphy,

3   Wixted, and Kandilis for violations of Section 20(a) of the 1934 Act.

4       83.     Defendants Oppenheimer, Armstrong, Murphy, Wixted, and Kandilis were officers

5   of the Champion Fund or its manager, Oppenheimer, and committed a primary violation of

6   Section 10(b) of the 1934 Act, 15 U.S.C. Section 78(j)(b), and Rule 10-5, 17 CFR Section

7   240.10b-5, promulgated thereunder, by false and misleading statements of material facts,

8   identified above, in connection with the purchase or sale of securities, which constituted a fraud on

9   the market and were, therefore, presumed to have been relied upon by Cohn. At the time that they

10  made these false and misleading statements, defendants named in this count either knew of, or

11  recklessly disregarded, their falsity. Furthermore, Cohn specifically relied upon the statements

12  and assurances given to him during the October telephone conference call by defendant Kandilis

13  regarding his investment in the Champion Fund, and the safety of this investment.

14      84.     Defendants Armstrong, Murphy, Wixted, and Kandilis, as well as Oppenheimer,

15  had direct control and/or supervisory involvement in the operations of the Champion Fund prior to

16  and during the relevant period set forth in this Complaint, and therefore have the power to control

17  or influence the particular transactions giving rise to the violations of the 1934 Act as alleged

18  herein and exercised the same.

19      85.     By reason of their status as officers, managers, and/or trustees of the Champion

20  Fund during the relevant period of this Complaint, Oppenheimer, Armstrong, Murphy, Wixted,

21  and Kandilis are "controlling persons" of the Champion Fund within the meaning of Section 20(a)

22  of the 1934 Act because each of them had the power and influence to cause the Fund to engage in

23  the unlawful conduct complained of herein. Through their positions of control, Oppenheimer,

24  Armstrong, Murphy, Wixted, and Kandilis were able to, and did, directly or indirectly control the

25  conduct of the Champion Fund's investments, the information contained in its filings with the

26  SEC, and public statements about its investments.

27      86.     As set forth above, defendants Oppenheimer, Armstrong, Murphy, Wixted, and

28  Kandilis violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder by their

acts and omissions as alleged in this Complaint.  By virtue of their positions as "controlling persons," these Defendants are liable under Section 20(a) of the 1934 Act.

87.   As a direct and proximate cause of the wrongful conduct set forth above in this count, Cohn suffered damages in connection with his purchase and investment in holdings of Champion Fund shares during the relevant period set forth in this Complaint.

**COUNT VI**
**VIOLATIONS OF CALIFORNIA CORPORATIONS CODE**
**SECTIONS 25400 AND 25500 AGAINST ALL DEFENDANTS**

88.   Plaintiffs refer to the allegations in paragraphs 1 through 52, inclusive, of this Complaint set forth hereinabove, and by this reference incorporates these allegations herein as though fully set forth.

89.   *California Corporations Code* Section 25400, subdivision (d) ("Section 25400") makes it unlawful  for a person selling securities, to make, for the purpose of inducing the purchase or sale of such security by others, any statement which was, at the time and in the light of the circumstances under which it was made, false or misleading with respect to any material fact, or which omitted to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and which he knew or had reasonable ground to believe was so false or misleading.

90.   *California Corporations Code* Section 25500 ("Section 25500") creates a private right of action against any person who willfully participates in any act or transaction in violation of Section 25400, and such person shall be liable to any other person who purchases or sells any security at a price which was affected by such act or transaction for the damages sustained by the latter as a result of such act or transaction.

91.   Defendants willfully participated in a series of acts and transactions in violation of Section 25400 and such wrongful conduct as alleged herein directly and proximately resulted in substantial financial loss to Cohn.

92.   Pursuant to Section 25500, Defendants, and each of them, are liable for the damages sustained by Cohn.

**COUNT VII**

## VIOLATIONS OF CALIFORNIA CORPORATIONS CODE
## SECTIONS 25401 AND 25501 AGAINST ALL DEFENDANTS

93.     Plaintiffs refer to the allegations in paragraphs 1 through 52, of this Complaint set forth hereinabove, and by this reference incorporates these allegations herein as though fully set forth.

94.     *California Corporations Code* Section 25401 ("Section 25401") makes it unlawful for any person to offer or sell a security in this state or buy or offer to buy a security by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

95.     *California Corporations Code* Section 25501 ("Section 25501") provides that any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him, who may sue either for rescission, or for damages (if the plaintiff or the defendant, as the case may be, no longer owns the security). Upon rescission, a seller may recover the security, upon tender of the consideration paid for the security plus interest at the legal rate, less the amount of any income received by the buyer on the security.

96.     *California Corporations Code* Section 25504 ("Section 25504") provides that every person who directly or indirectly controls a person liable under Section 25501, every partner in a firm so liable, every principal executive officer or director of a corporation so liable, every person occupying a similar status or performing similar functions, every employee of a person so liable who materially aids in the act or transaction constituting the violation, and every broker-dealer or agent who materially aids in the act or transaction constituting the violation, are also liable jointly and severally with and to the same extent as such person, unless the other person who is so liable had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

97.     Cohn hereby tenders his shares in the Champion Fund.

98.     Pursuant to Section 25504, Defendants, as sellers of the Champion Fund's shares to Cohn, are jointly and severally liable to Cohn for the damages Cohn has sustained as a direct and proximate result of Defendants' wrongful conduct in violation of Section 25401 as alleged herein.

## COUNT VIII
## COMMON LAW FRAUD AGAINST ALL DEFENDANTS
### (CALIFORNIA CIVIL CODE SECTION 1709)

99.     Plaintiffs refer to the allegations in paragraphs 1 through 52, of this Complaint set forth hereinabove, and by this reference incorporates these allegations herein as though fully set forth.

100.     As alleged hereinabove, Defendants made false and misleading written statements in the Registration Statements and Prospectuses regarding the Champion Fund, and Kandilis made false and misleading oral statements during his conference call with Cohn, and Cohn's broker Foster, on or about October 18, 2008.

101.     The false and misleading statements made by Kandilis to Cohn, and Cohn's broker, Foster, during the conference call in on or about October 18, 2008, regarding the Champion Fund, as well as the false and misleading written statements and commentary contained in the Registration Statements and Prospectuses available from Defendants to Cohn at that time, were specifically intended to induce Cohn to invest $2,000,000 in the Champion Fund.

102.     At the time that Defendants made these false and misleading statements, Defendants either knew of, or recklessly disregarded, their falsity.

103.     Cohn specifically relied upon the statements and assurances given to him during the October telephone conference call by Kandilis regarding his investment in the Champion Fund, and the safety of this investment. Cohn also relied upon the statements and commentary set for in the OppenheimerFund Portfolio Quarterly Updates and other general resources concerning the Champion Fund available to him at the time, which corroborated the assurances given to him by Cohn regarding the safety of Cohn's investment in the Champion Fund.

104.     Defendants' false and misleading statements to Cohn and his broker Foster have directly and proximately caused substantial financial loss to Cohn, for which Defendants, and each of them, are liable.

105.     Pursuant to *California Civil Code* Section 3294, for the sake of example, and by way of punishing Defendants, and each of them, Cohn seeks to recover punitive damages in an amount to be determined at the time of trial. Cohn's claim for punitive damages against

FIRST AMENDED COMPLAINT FOR VIOLATION OF
FEDERAL AND CALIFORNIA SECURITIES LAWS

1   Defendants is based upon the fraudulent, malicious, and oppressive conduct of Defendants with

2   respect to his investment in the Champion Fund. As alleged hereinabove, Defendants intentionally

3   misrepresented or concealed material facts about the Champion Fund, inducing Cohn to invest

4   $2,000,000.00 in the Champion Fund, and directly causing substantial financial losses to Cohn.

5   Defendants' conduct as alleged herein was malicious in that the misrepresentations, deceptive

6   statements, and concealments of material facts concerning the Champion Fund, were made with a

7   willful and conscious disregard for Cohn's rights as an investor in the Champion Fund. Further,

8   the conduct of Defendants was oppressive because the financial losses sustained as the result of

9   their misrepresentations, deceptive statements, and concealments of material facts concerning the

10  Champion Fund were an unjust hardship.

11

12  ## PRAYER FOR RELIEF

13

14          WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

15

16          A.      For an award of compensatory damages in favor of Plaintiffs against all

17  Defendants, jointly and severally, for all damages sustained as a result of Defendants'

18  wrongdoing, in an amount to be proven at time of trial, including interest accrued thereon;

19          B.      For an award of the reasonable costs and expenses incurred in this action, including

20  attorneys' fees and expert fees;

21          C.      For rescission or a rescissionary measure of damages;

22          D.      For punitive damages in any amount sufficient to set by way of example and to

23  punish Defendants, and each of them, for Defendants' fraudulent, malicious, and oppressive

24  conduct in an amount to be determined at the time of trial;

25          E.      For such other relief as may be deemed appropriate by the court.

26

27  ## JURY DEMAND

28          Plaintiffs hereby demand a trial by jury.

1  Dated:  September 9, 2009                    FOSTER♦ WALSH LLP

2

3

4                                              _____
                                               George A. Foster
5                                              John Boyce Jr.
                                               Attorneys for Plaintiffs DONALD L. COHN
6                                              and KAREN S. COHN, husband and wife, as
                                               joint tenants
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT FOR VIOLATION OF
FEDERAL AND CALIFORNIA SECURITIES LAWS